UNITED STATES COURT OF APPEALS
FOR DISTRICT OF COLUMBIA CIRCUIT

JUL - 1 2016

RECEIVED

UNITED STATES COURT OF APPEALS
FOR DISTRICT OF COLUMBIA CIRCUIT

FILED JUL - 1 2016

CLERK

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

MULTICULTURAL MEDIA,
TELECOM AND INTERNET
COUNCIL,

and LEAGUE OF UNITED LATIN
AMERICAN CITIZENS,

      Petitioners,

v.

FEDERAL COMMUNICATIONS
COMMISSION,

and UNITED STATES OF AMERICA,

      Respondents.

Case No. 16-1222

## PETITION FOR REVIEW

Pursuant to 47 U.S.C. § 402(a), 28 U.S.C. §§ 2342 and 2344, Rule 15(a) of the Federal Rules of Appellate Procedure and Rule 15 of the D.C. Circuit Rules, the Multicultural Media, Telecom and Internet Council, Inc. (MMTC) and the League of United Latin American Citizens, Inc. (LULAC) hereby respectfully petition this Court for review of the Federal Communications Commission's final order captioned *Amendment of the*

*Emergency Alert System*, EB Docket No. 04-296, FCC Docket No. 16-32, and EB Docket No. 06-119 (separately captioned *Recommendations of the Independent Panel Reviewing the Impact of Hurricane Katrina on Communications Networks*). The Final Rule was published in the Federal Register on May 6, 2016. *See* 81 Fed. Reg. 27,342 (May 6, 2016). A copy of the Final Rule is attached to this petition for review.

Venue lies in this Court pursuant to 28 U.S.C. § 2343. MMTC and LULAC both have their principal offices in Washington, D.C.

MMTC is a national not-for-profit organization dedicated to promoting and preserving equal opportunity and civil rights in the mass media, telecommunications, and broadband industries. MMTC is the leading advocate for minority participation in the communications industries. MMTC seeks to close the digital divide. MMTC has standing because, among other things, it was an author of the original petition for relief, was a party to the proceedings before the FCC, and is injured by the Final Rule. *See* 28 U.S.C. § 2344.

With approximately 132,000 members throughout the United States and Puerto Rico, LULAC is the largest and oldest Hispanic organization in the United States. LULAC advances the economic condition, educational attainment, political influence, housing, health, and civil rights of Hispanic

Americans. LULAC has standing because its members are aggrieved and otherwise injured by the Final Rule, and LULAC participated in the proceedings below. *See id.*

In the Final Rule, the FCC granted in part and denied in part an emergency petition filed by MMTC, the Independent Spanish Broadcasters Association, and the Office of Communication of the United Church of Christ, Inc. The emergency petition was filed in the wake of Hurricane Katrina, when the electric grid went down in New Orleans and radio was the only means of communication for several days. For the first eight days after Katrina, the only Spanish language station near New Orleans, KGLA(AM), was off the air, and the English language stations had no plan under which one of them would provide emergency information in Spanish. Thus, over 100,000 Spanish-speaking persons had no means of receiving information during those eight days of high vulnerability. In the emergency petition, MMTC and others asked the FCC to modify its emergency broadcasting rules to require all of the broadcasters in a given market to designate one station to provide emergency information in widely spoken languages during and immediately after an emergency such as a hurricane. After eleven years, the FCC denied MMTC's request and instead asked broadcasters to merely report any multilingual emergency alert activities they are voluntarily

3

undertaking. In other words, the FCC imposed a reporting requirement but did not mandate any real progress toward life-saving multilingual alerts.

MMTC and LULAC contend that the Final Rule is arbitrary and capricious, an abuse of discretion, and otherwise contrary to the law. *See* 5 U.S.C. § 706(2).

Accordingly, Petitioners respectfully request that this Court (1) hold that the FCC's Final Rule was unlawful, (2) vacate the Rule in part, (3) remand to the FCC for an order consistent with this Court's findings, and (4) provide such other relief as this Court deems appropriate.

Dated: July 1, 2016

Respectfully submitted,

By: *[signature: Cliff M. Sloan]*

Clifford M. Sloan
   D.C. Circuit Bar No. 37874
John M. Beahn
Caroline S. Van Zile*
Skadden, Arps, Slate, Meagher &
   Flom LLP
1440 New York Avenue, N.W.
Washington, D.C. 20005
T: 202/371-8000
Fax: 202/661-8340
Email: cliff.sloan@skadden.com

*Counsel to MMTC and LULAC*

*Admitted to practice in Pennsylvania only; supervised by a member of the D.C. Bar



IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

MULTICULTURAL MEDIA,
TELECOM AND INTERNET
COUNCIL,

and LEAGUE OF UNITED LATIN
AMERICAN CITIZENS,

                Petitioners,

v.

FEDERAL COMMUNICATIONS
COMMISSION,

and UNITED STATES OF AMERICA,

                Respondents.

Case No. 16-1222

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and this Court's Rule 26.1, Petitioner Multicultural Media, Telecom and Internet Council, Inc. (MMTC) states as follows:

MMTC is a national not-for-profit organization dedicated to promoting and preserving equal opportunity and civil rights in the mass media, telecommunications, and broadband industries. It has no parent

company and has not issued any shares or debt securities to the public; thus, no publicly held company owns ten percent or more of its stock.

Pursuant to Federal Rule of Appellate Procedure 26.1 and this Court's Rule 26.1, Petitioner League of United Latin American Citizens, Inc. (LULAC) states as follows:

LULAC is a national not-for-profit membership organization that advances the economic condition, educational attainment, political influence, housing, health, and civil rights of Hispanic Americans. It has no parent company and has not issued any shares or debt securities to the public; thus, no publicly held company owns ten percent or more of its stock.

Dated: July 1, 2016

Respectfully submitted,

By:

/s/ Clifford M. Sloan

Clifford M. Sloan
   D.C. Circuit Bar No. 37874
John M. Beahn
Caroline S. Van Zile*
Skadden, Arps, Slate, Meagher &
   Flom LLP
1440 New York Avenue, N.W.
Washington, D.C. 20005
T: 202/371-8000
Fax: 202/661-8340
Email: cliff.sloan@skadden.com

*Counsel to MMTC and LULAC*

*Admitted to practice in Pennsylvania only; supervised by a member of the D.C. Bar

3

## CERTIFICATE OF SERVICE

I hereby certify that, on this 1st day of July, 2016, I caused an original and four copies of the foregoing Petition for Review and Corporate Disclosure Statement to be filed with the Clerk of the Court for the U.S. Court of Appeals for the D.C. Circuit via hand delivery. I further certify that I caused copies of the foregoing Petition for Review and Corporate Disclosure Statement to be served via hand delivery upon the following parties:

Jon Sallet
General Counsel
Federal Communications Commission
445 12th Street, S.W., Room 8-A741
Washington, DC 20554

The Honorable Loretta Lynch
Attorney General
U.S. Department of Justice
950 Pennsylvania Avenue, N.W.
Washington, DC 20530-0001

Clifford M. Sloan
    D.C. Circuit Bar No. 37874
Skadden, Arps, Slate, Meagher & Flom LLP
1440 New York Avenue, N.W.
Washington, D.C. 20005
T: 202/371-8000
Fax: 202/661-8340
Email: cliff.sloan@skadden.com

# ATTACHMENT A

Environmental Justice in Minority Populations and Low-Income Populations'' (59 FR 7629, February 16, 1994).

Since tolerances and exemptions that are established on the basis of a petition under FFDCA section 408(d), such as the tolerance in this final rule, do not require the issuance of a proposed rule, the requirements of the Regulatory Flexibility Act (RFA) (5 U.S.C. 601 *et seq.*), do not apply.

This action directly regulates growers, food processors, food handlers, and food retailers, not States or tribes, nor does this action alter the relationships or distribution of power and responsibilities established by Congress in the preemption provisions of FFDCA section 408(n)(4). As such, the Agency has determined that this action will not have a substantial direct effect on States or tribal governments, on the relationship between the national government and the States or tribal governments, or on the distribution of power and responsibilities among the various levels of government or between the Federal Government and Indian tribes. Thus, the Agency has determined that Executive Order 13132, entitled ''Federalism'' (64 FR 43255, August 10, 1999) and Executive Order 13175, entitled ''Consultation and Coordination with Indian Tribal Governments'' (65 FR 67249, November 9, 2000) do not apply to this action. In addition, this action does not impose any enforceable duty or contain any unfunded mandate as described under Title II of the Unfunded Mandates Reform Act (UMRA) (2 U.S.C. 1501 *et seq.*).

This action does not involve any technical standards that would require Agency consideration of voluntary consensus standards pursuant to section 12(d) of the National Technology Transfer and Advancement Act (NTTAA) (15 U.S.C. 272 note).

### VII. Congressional Review Act

Pursuant to the Congressional Review Act (5 U.S.C. 801 *et seq.*), EPA will submit a report containing this rule and other required information to the U.S. Senate, the U.S. House of Representatives, and the Comptroller General of the United States prior to publication of the rule in the **Federal Register**. This action is not a ''major rule'' as defined by 5 U.S.C. 804(2).

### List of Subjects in 40 CFR Part 180

Environmental protection, Administrative practice and procedure, Agricultural commodities, Pesticides and pests, Reporting and recordkeeping requirements.

Dated: April 28, 2016.

**Susan Lewis,**

*Director, Registration Division, Office of Pesticide Programs.*

Therefore, 40 CFR chapter I is amended as follows:

### PART 180—[AMENDED]

■ 1. The authority citation for part 180 continues to read as follows:

**Authority:** 21 U.S.C. 321(q), 346a and 371.

■ 2. In § 180.458, in the table in paragraph (a):
■ a. Remove the entry for ''Bean, dry, seed;''
■ b. Add alphabetically an entry for ''Berry, low growing, subgroup 13–07G, except cranberry;''
■ c. Remove the entry for ''Canola seed;''
■ d. Add alphabetically an entry for ''Cottonseed subgroup 20C;''
■ e. Remove the entry for ''Cotton, undelinted seed;''
■ f. Add alphabetically entries for ''Fruit, pome, group 11–10'' and ''Fruit, stone, group 12–12;''
■ g. Remove the entries for ''Mustard, seed'' and ''Onion, bulb;''
■ h. Add alphabetically an entry for ''Onion, bulb, subgroup 3–07A;''
■ i. Remove the entries for ''Peach'' and ''Potato;''
■ j. Add alphabetically an entry for ''Rapeseed subgroup 20A, except flax seed;''
■ k. Remove the entries for ''Safflower, seed,'' ''Sesame, seed,'' and ''Strawberry;''
■ l. Add alphabetically an entry for ''Stevia, dried leaves;''
■ m. Remove the entries for ''Sunflower, seed,'' and ''Vegetable, fruiting group 8;'' and
■ n. Add alphabetically the entries for ''Sunflower subgroup 20B'' and ''Vegetable, fruiting, group 8–10.''

The additions read as follows:

**§ 180.458  Clethodim; tolerance for residues.**

(a) * * *

| Commodity | Parts per million |
|---|---|
| * * * * * | |
| Berry, low growing, subgroup 13–07G, except cranberry | 3.0 |
| * * * * * | |
| Cottonseed subgroup 20C | 1.0 |
| * * * * * | |
| Fruit, pome, group 11–10 | 0.20 |
| Fruit, stone, group 12–12 | 0.20 |
| * * * * * | |
| Onion, bulb, subgroup 3–07A | 0.50 |
| * * * * * | |
| Rapeseed subgroup 20A, except flax seed | 0.50 |
| * * * * * | |
| Stevia, dried leaves | 12 |
| * * * * * | |
| Sunflower subgroup 20B | 5.0 |
| * * * * * | |
| Vegetable, fruiting, group 8–10 | 1.0 |
| * * * * * | |

* * * * *

[FR Doc. 2016–10738 Filed 5–5–16; 8:45 am]

**BILLING CODE 6560–50–P**

## FEDERAL COMMUNICATIONS COMMISSION

### 47 CFR Part 11

[ET Docket No. 04–296; FCC 16–32]

### Amendment of the Emergency Alert System

**AGENCY:** Federal Communications Commission.

**ACTION:** Final rule.

**SUMMARY:** In this document, the Federal Communications Commission (FCC or Commission) revises its rules governing the Emergency Alert System (EAS) to incorporate new multilingual alerting reporting requirements into its State EAS Plan reporting requirements. The Commission takes this action in response to a Petition for Immediate Interim Relief (Petition) jointly filed by the Independent Spanish Broadcasters Association (ISBA), the Office of Communication of the United Church of Christ, Inc., and the Minority Media and Telecommunications Council (now called The Multicultural, Media, Telecom and Internet Council) (MMTC) (collectively, ''Petitioners'').

**DATES:** Effective June 6, 2016, except for the amendments to § 11.21(d) through (f), which contain modifications to information collection requirements that were previously approved by the Office of Management and Budget (OMB). Once OMB has approved the modifications to these collections, the Commission will publish a document in the **Federal Register** announcing the effective date of those paragraphs and rule amendments.

FOR FURTHER INFORMATION CONTACT: Lisa Fowlkes, Deputy Bureau Chief, Public Safety and Homeland Security Bureau, at (202) 418–7452, or by email at Lisa.Fowlkes@fcc.gov.

SUPPLEMENTARY INFORMATION: This is a summary of the Commission's Order (*Order*) in ET Docket No. 04–296, FCC 16–32, adopted on March 23, 2016, and released on March 30, 2016. The full text of this document is available for inspection and copying during normal business hours in the FCC Reference Center (Room CY–A257), 445 12th Street SW., Washington, DC 20554. The full text may also be downloaded at: *www.fcc.gov*.

**Synopsis of the Order**

1. The *Order* revises the EAS rules to require State EAS Plans to include a description of the manner, if any, in which EAS Participants (the broadcasters, cable systems, and other service providers subject to the EAS rules) make available EAS alert message content to persons who communicate in languages other than English. The *Order* requires EAS Participants to furnish such information to State Emergency Communications Committees (SECC) upon SECC request so that the SECCs can compile this data and submit it as part of their State EAS Plan.

2. The Commission adopts these requirements in response to the Petition. As a general matter, the Commission supports the Petitioners' goals and has, accordingly, provided repeated opportunities for comment. As described below, the Petition proposes various changes to the Part 11 rules governing the EAS to facilitate the dissemination of multilingual EAS alerts and non-EAS emergency information. Although the Commission does not find that the facts and record support the Petitioners' proposed Part 11 rule revisions, it finds that the reporting requirements adopted in the *Order* will, by other means, provide information that may facilitate the dissemination of multilingual local, state and national emergency information via the EAS. Thus, the Commission declines to grant the Petition's proposed Part 11 rule changes, but adopts reporting requirements to acquire information that may facilitate the dissemination of multilingual local, state and national emergency information via the EAS.

**I. Background**

*A. The EAS*

3. The EAS is a national public warning system through which broadcasters, cable systems, and other EAS Participants deliver alerts to the public to warn them of impending emergencies and dangers to life and property. The primary purpose of the EAS is to provide the President with "the capability to provide immediate communications and information to the general public at the National, State and Local Area levels during periods of national emergency." The EAS also is used to distribute alerts issued by state and local governments, as well as by the National Weather Service (NWS). Although EAS Participants are required to broadcast Presidential alerts, they participate in broadcasting state and local EAS alerts on a voluntary basis. As the Commission noted previously in this docket, its authority to require participation in the EAS emanates from sections 1, 4(i) and (o), 303(r), and 706 of the Communications Act. The Commission, the Federal Emergency Management Agency (FEMA), and the NWS implement the EAS at the federal level.

4. The EAS is a broadcast-based, hierarchical alert message distribution system in which an alert message originator at the local, state or national level encodes (or arranges to have encoded) a message in the EAS Protocol. The alert is then broadcast from one or more EAS Participants, and subsequently relayed from one station to another until all affected EAS Participants have received the alert and delivered it to the public. This process of EAS alert distribution among EAS Participants is often referred as the "daisy chain" distribution architecture. Because this EAS architecture has been in place since the inception of the EAS, it is often referred to as the "legacy EAS." Since June 30, 2012, however, authorized emergency alert authorities also have been able to distribute EAS alerts over the Internet to EAS Participants (who in turn deliver the alert to the public) by formatting those alerts in the Common Alerting Protocol (CAP) and delivering those alerts through the FEMA administered Integrated Public Alert and Warning System (IPAWS). This CAP-based process for distributing alerts to EAS Participants represents the "IP-based EAS."

5. Both the legacy and IP-based EAS architectures are designed so that EAS Participants deliver to the public the alert content they receive from the EAS sources they monitor. Further, the EAS architecture and equipment is designed to operate automatically, both to minimize the risk of operator error and to facilitate EAS operation at unattended stations. Because the EAS is a top-down, closed, automated message distribution system in which alert messages are passed along from one entity to another—under tight technical tolerances required to ensure that the system functions properly—EAS Participants currently have a limited capacity to alter the content of the alert messages they receive, including translations of messages to alternate languages.

6. In particular, the EAS header codes, End-of-Message (EOM) code, and audio message (if included) that comprise any given EAS alert are determined by the entity that originates the alert (typically, the NWS or state and local emergency management authorities). The EAS equipment of EAS Participants that receive the EAS alert convert the header codes into visual crawls and broadcast the audio—if the EAS Participant's broadcasts are monitored by downstream stations, it will re-encode (regenerate) the alert so as to trigger EAS equipment in such monitoring stations, thus perpetuating the daisy chain alert distribution cycle. All of these functions are typically done automatically. In terms of timing, state and local EAS alerts are required to be broadcast within 15 minutes of receipt, and the alert messages themselves are typically limited to a duration of two minutes. An EAS Participant seeking to broadcast a non-English language translation of the audio message contained in the EAS alert message it receives within the parameters of the EAS rules, would have to manually (1) ensure the entire length of the alert, including the translated audio portion, did not exceed two minutes, and (2) complete the translation and insertion processes within 15 minutes. Further, any such audio generated by that EAS Participant would be captured by downstream stations monitoring its broadcasts, thus raising the potential for the translated audio being rebroadcast (by the monitoring stations) to unintended audiences. The same timing elements would hold true for the visual portion of the alert, which under the legacy system is a textual rendition of the location, event, time period and other relevant header code elements.

7. Although EAS Participants currently have limited capacity to alter the alert message content they receive, the Part 11 rules allow EAS Participants that provide non-English language programming to broadcast state and local EAS announcements in the primary language of the EAS Participant. Accordingly, non-English language EAS Participants may, for example, broadcast required visual crawls in their primary language and include in such crawls translations of

other language(s), if their equipment permits. Further, CAP provides alert originators with the capability to provide both enhanced text concerning an emergency condition (such as where to seek shelter) and multiple translations of such text. The Commission also permits, but does not require, EAS Participants to utilize Text-to-Speech (TTS) software, if configured in their EAS equipment, to generate multiple language audio translations of enhanced text contained in a CAP alert message. Accordingly, there are mechanisms in place currently to distribute multilingual EAS alerts.

8. In adopting rules to facilitate CAP alerting in the Fifth Report and Order (*Fifth Report and Order*) in EB Docket No. 04–296, 77 FR 16706, March 22, 2012, the Commission concluded that it was necessary to maintain the legacy EAS alert distribution architecture. The Commission therefore limited the CAP-related changes it made to the Part 11 EAS rules to ensuring that EAS Participants' EAS equipment will be capable of receiving and converting CAP-formatted messages into an EAS Protocol-compliant message. In taking this approach, the Commission observed that the legacy EAS architecture provided certain inherent operational benefits, including a robust capability to provide the public with alerts even after damage to the electrical power grid, and that replacing this legacy system altogether was both premature and technically unfeasible. The Commission also observed that its approach to CAP and its CAP EAS rules were consistent with FEMA's efforts to integrate the EAS with IPAWS. Accordingly, while CAP greatly expands the scope of information that alert originators can distribute directly to EAS Participants, the legacy EAS remains the backbone for distributing information between EAS Participants via the daisy chain process.

9. As indicated, state and local emergency management authorities use the EAS to originate state and localized emergency alert messages. Section 11.21 of the EAS rules, 47 CFR 11.21, requires that state and local EAS operations must be described in State (and Local) EAS Plans, which must be submitted to the Commission for approval so that the Commission can ensure that these operations are consistent with national plans, FCC regulations, and national EAS operations. State EAS Plans are compiled and maintained by SECCs, and include information related to state and federal activations of the EAS.

*B. The Petition*

10. The Petition proposes various modifications to the Commission's Part 11 rules to "provide for the dissemination of multilingual local, state and national emergency information via the EAS." MMTC has submitted various comments and *ex parte* filings subsequent to the Petition's filing that explicate its positions on the Petition and, more generally, multilingual emergency alerts and information. For example, in 2010, MMTC stated that "the problem today is receiving information in-language during and after an emergency." In 2013, MMTC stated that the Commission should require "broadcasters to work together, and with state and market counterparts, to develop a plan that communicates each party's responsibility based on likely contingencies."

*C. Procedural History*

11. The Commission formally sought comment on the Petition in the First Report and Order and Further Notice of Proposed Rulemaking (*First Report and Order and Further Notice of Proposed Rulemaking*) in EB Docket No. 04–296, 70 FR 71023, 71072, November 25, 2005, asking, among other things, how the Petition's proposals could be implemented and inviting comment on any other proposals regarding how best to provide alerts to non-English speakers. The Commission received five comments and reply comments addressing the Petition specifically, all of which (except for those filed by MMTC) opposed the Petition's proposals. With respect to multilingual alerting generally, the majority of comments addressing this issue contended that responsibility for issuing multilingual alerts should rest with alert message originators, and that it would be impractical and unduly burdensome for EAS Participants to translate, transcribe or otherwise effect multilingual alerting at their facilities.

12. The Commission subsequently took up the Petition in the Second Report and Order and Further Notice of Proposed Rulemaking (*Second Report and Order and Further Notice of Proposed Rulemaking*), in EB Docket No. 04–296, 72 FR 62123, 62195, November 2, 2007. Specifically, the Commission observed that "Petitioners' request is broader than the formal EAS structure." In the Further Notice portion of the *Second Report and Order and Further Notice of Proposed Rulemaking*, the Commission sought more general comment on the technical, economic, practical, and legal issues involved in making emergency information accessible to persons whose primary language is not English. The majority of responding comments again opposed any obligation on EAS Participants to supply non-English alerts, contending that responsibility for issuing multilingual alerts should rest with alert message originators, and that it would be impractical for EAS Participants to effect multilingual alerting at their facilities.

13. On March 25, 2010, the Public Safety and Homeland Security Bureau (Bureau) released a Public Notice (*Part 11 Public Notice*) in EB Docket No. 04–296, DA 10–500, released on March 25, 2010, which sought comment regarding what changes to the Part 11 rules might be needed to fully implement the obligation to process CAP-formatted alerts. Although the *Part 11 Public Notice* did not seek comment specifically on the Petition, the Bureau invited comment generally on "what rules changes, if any, are necessary to our Part 11 rules to ensure access to a CAP-based EAS by people . . . who do not speak English." Again, the vast majority of comments addressing this issue contended that alert message originators must be responsible for providing the alert in the languages of the area being alerted.

14. On March 11, 2014, the Bureau released a Public Notice in EB Docket No. 04–296, DA 14–336, released on March 11, 2014, which sought to refresh the record on the Petition initiated by the *First Report and Order and Further Notice of Proposed Rulemaking*, by, among other things, requesting updates on the state of multilingual EAS alerts and other possible solutions by which the Commission could facilitate multilingual EAS alerts. The Bureau also sought updated comment on the specific proposals in the Petition as well as on MMTC's proposal, articulated in its December 12, 2013, *ex parte* letter filed in EB Docket No. 04–296, that broadcast stations within any given market be required to enter into emergency communications plans to support each other in the case of an emergency. While all respondents generally supported the goals of the Petition, EAS Participant respondents opposed the methods proposed to achieve them. Non-EAS Participant parties supported MMTC's goal of serving non-English speakers, but either did not address or did not directly support the methods requested by the Petition.

15. MMTC responded to objections that the Petition was inconsistent with the EAS architecture by contending that while its proposals "include EAS alerts,

the primary goal of [its emergency communications plan] proposal is to ensure broadcasters, in their capacity as public trustees, distribute emergency information before, during, and after an emergency in the languages understood by the communities they serve." MMTC contended that translation technology "is not yet capable of capturing the nuances of language through which critical information is transmitted, making it essential that a real person convey lifesaving information in a variety of languages," and that "[u]nder the designated hitter model, multilingual messages should be translated at the point of origin or broadcast by a live person." MMTC also contended that "[v]oluntary plans have not been put into place since Hurricane Katrina set this proceeding in motion," and that "[n]one of the State EAS plans address multilingual EAS alerts."

## II. Discussion

*A. State EAS Plans Must Describe State Multilingual EAS Alerting Activities*

16. Consistent with the record in this proceeding, the Commission supports the general goal of making emergency alert content distributed over the EAS more accessible to persons whose primary language is not English. While providing multilingual translations of an EAS alert audio message as part of a state or local EAS alert that is processed in automated mode can only be effected by the alert originator, some capabilities do exist within the EAS structure for distributing non-English language translations of the alert content, such as through the EAS visual crawl. States and localities that have the capabilities to originate CAP-formatted alert messages have more flexibility to distribute EAS alerts—enhanced textual information and audio—in multiple languages. Moreover, states have always had the flexibility to implement state and local EAS alerting however they see fit, provided such implementations are consistent with the existing EAS technical and operational architecture and the Part 11 rules.

17. The Commission agrees with the majority of commenters that alert originators are best positioned to effect multilingual alerting, since station operators simply pass down the EAS message as received within the allotted two minute timeframe and, by and large, do not have the necessary capabilities and/or time to translate or originate that alert in another language. The Commission observes that comments submitted in response to the *2014 Public Notice* suggest that mandated "one size fits all" solutions to addressing the issue of multilingual EAS alert content and, more generally, non-EAS emergency information, may not account for the variance of key factors, such as the make-up of the local population, topography, etc., that applies in each market.

18. The Commission also observes, however, that State EAS Plans currently on file do not describe what actions the state or its localities, in conjunction with the EAS Participants therein, or the EAS Participants themselves, whether acting individually or collectively, are taking with respect to distributing EAS alert content to non-English speaking audiences. Accordingly, to ensure that the Commission has sufficient and accurate information on any existing state and local mechanisms to distribute multilingual state and local EAS alert content, and more generally, to ensure that the issue of disseminating EAS alert content to non-English speaking audiences has been examined by EAS Participants and state and local emergency authorities, as coordinated by the SECCs, the *Order* requires that State EAS Plans include a description of what steps, if any, have been or will be taken by EAS Participants, whether individually or in conjunction with state and local emergency authorities, to disseminate, broadcast, or otherwise make available, EAS alert content to non-English speaking audiences in such audiences' primary language. Such descriptions shall include relevant factors that explain the degree to which alerts have been disseminated or broadcast in multiple languages. As a corollary to this reporting requirement, the *Order* requires EAS Participants to cooperate with state and local emergency authorities, and SECCs, to identify such information. The Commission mandates no specific compliance method, but rather wishes to provide the broadest flexibility to state and local governments and EAS Participants to describe any steps that have been taken to provide multilingual EAS Alerts for their respective communities. This requirement may be fulfilled by indicating that no steps have been taken.

19. In order that we may assess these efforts, we require EAS Participants to provide the following information to their respective SECCs, who in turn will include such information in the State EAS Plan submitted to the Commission for approval:

• A description of any actions taken by the EAS Participant (acting individually, in conjunction with other EAS Participants in the geographic area, and/or in consultation with state and local emergency authorities), to make EAS alert content available in languages other than English to its non-English speaking audience(s);

• A description of any future actions planned by the EAS Participant, in consultation with state and local emergency authorities, to provide EAS alert content in languages other than English to its non-English speaking audience(s), along with an explanation for the EAS Participant's decision to plan or not plan such actions; and

• Any other relevant information that the EAS Participant may wish to provide, including state-specific demographics on languages other than English spoken within the state, and identification of resources used or necessary to originate current or proposed multilingual EAS alert content. In particular we urge EAS Participants and SECCs to include any pilot projects or other initiatives that involve translation technologies or other innovative approaches to providing non-English alerts and emergency information to the public.

20. This information will enable the Commission to ensure that any existing multilingual EAS alerting activities are consistent with the Part 11 rules, and may provide insight into what mechanisms may work best. Similarly, information identifying why multilingual EAS activities are not being planned may provide insight into structural impediments that might be ameliorated by future Commission or federal action, if appropriate. The collection and availability of this information also will aid states, EAS Participants, non-governmental organizations and other interested parties in their efforts, if any, to establish mechanisms for disseminating multilingual EAS content and other emergency information. In terms of mechanics, the *Order* requires that EAS Participants furnish the required information to SECCs no later than one year from the effective date of the *Order*, and that all required information be compiled and summarized by the SECCs and included in or submitted as amendments to the State EAS Plans no later than six months after that. The Commission concludes that one year is sufficient time for EAS Participants to gather, prepare and submit the required information, as the vast majority of the required information is already in their possession as it is required in their regular course of business. The Commission further concludes that the integration of this data into a State EAS Plan, either as an amendment or a new plan, is a largely administrative process for which six months should be sufficient. In the event that there is a

material change to any of the information that EAS Participants are required to furnish their respective SECCs, EAS Participants must, within 60 days of the occurrence of such material change, submit a letter to their respective SECCs, copying the Bureau, that describe such change. The *Order* requires SECCs to incorporate the information in such letters as amendments to the State EAS Plans on file with the Bureau.

21. Beyond this reporting requirement, the *Order* does not require any particular outcome with respect to what is done to facilitate access to multilingual EAS alert content. EAS Participants may conclude that no specific actions to facilitate access to multilingual EAS alert content is warranted or feasible in their area for any number of reasons. On the other hand, the mere process of examining this issue in coordination with state and local emergency authorities may lead to implementation of mechanisms that would expand access to EAS alert content, if appropriate.

22. The Commission believes that the compliance costs to EAS Participants of the rules adopted in the *Order* will be minimal, and largely limited to internal administrative charges associated with drafting a brief statement, and submitting that statement, and any other relevant information that the EAS Participant may wish to provide to their SECC for inclusion into the State EAS Plan for the state in which the EAS Participant operates. Based on the record, it seems likely that the vast majority of EAS Participants will need to submit nothing more than a very brief statement to their SECC explaining their decision to plan or not plan future actions to provide EAS alert content in languages other than English to their non-English speaking audience(s).

23. For the presumably small percentage of EAS Participants that actually are engaged in multilingual EAS activities, the filing will merely require that they supply a summary of actions they already have taken in this regard. Because the Commission anticipates that the aggregate costs associated with requiring EAS Participants to file summary statements or activities reports will be minimal, the potential benefits of promoting the delivery of alerts to those who communicate in a language other than English or may have a limited understanding of the English language will far exceed those costs imposed.

24. With regard to these benefits, the Commission finds that accurately understanding how the EAS is accessible to the entire public, including those who do not have a proficiency in English, will strengthen this already resilient public alert and warning tool in a manner that may help save lives and protect property during times of national, state, regional, and local emergencies.

25. Finally, the Commission's decision is limited to EAS content—*i.e.,* information that is formatted in the EAS Protocol or CAP and processed over existing EAS equipment and facilities. While MMTC has asserted that "the problem today is receiving information in-language during and after an emergency," the Commission observes that the EAS is not designed to function as a conduit for non-EAS emergency information, and such information falls outside the scope of the EAS and the Part 11 rules.

*B. The Petition's Proposals Are Unsupported and Lack Specificity*

26. The Commission has observed that the record in this proceeding provides scant support for the methods proposed by the Petition to achieve their outcomes. Instead, as indicated, the vast majority of commenters have consistently argued that state and local authorities responsible for originating alerts are best positioned to distribute multilingual alerts, and therefore should be responsible for the language content of alerts. The record also supports reliance upon voluntary arrangements among and between EAS Participants and other parties to achieve multilingual solutions that reflect the resources, localized needs and environmental characteristics of the communities they serve. These facts and record do not support the Petition's proposed revisions to the Part 11 rules.

27. The Commission also observes, as commenters have pointed out, that the Petition's proposed methods for implementing the Designated Hitter plan within the EAS architecture lack specificity, and it is therefore difficult to determine whether or how such implementation could be effected from the federal level. Commenters also have observed that the Petition's proposals implicate technical problems that could compromise the operation of the EAS. In sum, the concludes that the Petition does not provide sufficient detail as to the precise functionalities it seeks to achieve through its proposed Part 11 rule revisions and how those could be implemented within the technical architecture, including the EAS Protocol and distribution mechanisms, of the EAS.

28. Against this backdrop, and given that options for effectuating multilingual EAS alerts at the local level necessitates voluntary solutions tailored to the relevant multilingual needs of the community served, the Commission does not support moving forward with the Petition's specific proposals. Accordingly, while the Commission grants the Petition to the extent the actions taken in the *Order* are consistent with the Petition's stated purpose of facilitating the dissemination of multilingual local, state and national emergency information via the EAS—*i.e.,* by amending the Part 11 rules to incorporate the reporting requirements described above—the Commission otherwise denies the Petition.

**III. Procedural Matters**

*A. Accessible Formats*

29. To request materials in accessible formats for people with disabilities (Braille, large print, electronic files, audio format), send an email to *fcc504@fcc.gov* or call the Consumer & Governmental Affairs Bureau at 202–418–0530 (voice), 202–418–0432 (TTY).

*B. Regulatory Flexibility Analysis*

30. As required by the Regulatory Flexibility Act of 1980, see 5 U.S.C. 603, the Commission has prepared a Final Regulatory Flexibility Analysis (FRFA) of the possible significant economic impact on small entities of the policies and rules addressed in this document.

*C. Paperwork Reduction Act Analysis*

31. This document contains modified information collection requirements subject to the Paperwork Reduction Act of 1995 (PRA), Public Law 104–13. These modified requirements will be submitted to the Office of Management and Budget (OMB) for review under Section 3507(d) of the PRA. OMB, the general public, and other Federal agencies will be invited to comment on the new or modified information collection requirements contained in this proceeding. In addition, we note that pursuant to the Small Business Paperwork Relief Act of 2002, Public Law 107–198, see 44 U.S.C. 3506(c)(4), we previously sought specific comment on how the Commission might further reduce the information collection burden for small business concerns with fewer than 25 employees.

32. In this present document, we have assessed the effects of the information collection associated with the reporting requirements set forth in this *Order,* and find that because this information collection involves information that is readily available and easily accessible to all EAS Participants, none of these requirements should pose a substantial

burden for businesses with fewer than 25 employees.

### D. Congressional Review Act

33. The Commission will send a copy of this *Order* to Congress and the Government Accountability Office pursuant to the Congressional Review Act ("CRA"), see 5 U.S.C. 801(a)(1)(A).

### E. Final Regulatory Flexibility Analysis

34. As required by the Regulatory Flexibility Act of 1980, as amended (RFA), an Initial Regulatory Flexibility Analysis (IRFA) was incorporated into the First Report and Order and Further Notice of Proposed Rulemaking (First Report and Order and Further Notice of Proposed Rulemaking) in EB Docket No. 04–296, 70 FR 71023, 71072, November 25, 2005. The Commission sought written comment on the proposals in the Further Notice portion of the First Report and Order and Further Notice of Proposed Rulemaking, including comment on the IRFA. Because the Order amends the Commission's rules, this Final Regulatory Flexibility Analysis (FRFA) conforms to the RFA.

1. Need for, and Objectives of, the Order

35. This *Order* adopts changes to the Commission's Part 11 rules governing the Emergency Alert System (EAS) to require that State EAS Plans include a description of what steps have been taken by broadcasters, cable systems, and other entities subject to the Part 11 rules (generally referred to as "EAS Participants"), whether individually or in conjunction with state and local emergency authorities, to disseminate or broadcast, or otherwise make available, EAS alert content to non-English speaking audiences in such audiences' primary language. This *Order* also requires that State EAS Plans include a description of any future actions planned by EAS Participants, in consultation with state and local emergency authorities, to provide EAS alert content available in languages other than English to its non-English speaking audience(s), along with an explanation for the Participant's decision to plan or not plan such actions. The objectives of this rule change are to ensure that the Commission has sufficient and accurate information on any existing state and local mechanisms to distribute multilingual state and local EAS alert content, and more generally, to ensure that the issue of disseminating EAS alert content to non-English speaking audiences has been examined by EAS Participants and state and local emergency authorities, as coordinated by the State Emergency Communications Committees.

1. Summary of Significant Issues Raised by Public Comments in Response to the IRFA

36. The Small Business Administration (SBA) filed no comments in this proceeding, and there were no other comments specifically addressed to the IRFA.

2. Description and Estimate of the Number of Small Entities to Which Rules Will Apply

37. The RFA directs agencies to provide a description of and, where feasible, an estimate of, the number of small entities that may be affected by the rules adopted herein. The RFA generally defines the term "small entity" as having the same meaning as the terms "small business," "small organization," and "small governmental jurisdiction." In addition, the term "small business" has the same meaning as the term "small business concern" under the Small Business Act. A "small business concern" is one which: (1) Is independently owned and operated; (2) is not dominant in its field of operation; and (3) satisfies any additional criteria established by the SBA.

38. *Small Businesses, Small Organizations, and Small Governmental Jurisdictions.* Our action may, over time, affect small entities that are not easily categorized at present. We therefore describe here, at the outset, three comprehensive, statutory small entity size standards. First, nationwide, there are a total of approximately 28.2 million small businesses, according to the SBA. In addition, a "small organization" is generally "any not-for-profit enterprise which is independently owned and operated and is not dominant in its field." Nationwide, as of 2007, there were approximately 1,621,315 small organizations. Finally, the term "small governmental jurisdiction" is defined generally as "governments of cities, towns, townships, villages, school districts, or special districts, with a population of less than fifty thousand." Census Bureau data for 2011 indicate that there were 89,476 local governmental jurisdictions in the United States. We estimate that, of this total, as many as 88,506 entities may qualify as "small governmental jurisdictions." Thus, we estimate that most governmental jurisdictions are small.

39. *Television Broadcasting.* The SBA defines a television broadcasting station that has no more than $35.5 million in annual receipts as a small business. Business concerns included in this industry are those primarily engaged in broadcasting images together with sound. These establishments operate television broadcasting studios and facilities for the programming and transmission of programs to the public. These establishments also produce or transmit visual programming to affiliated broadcast television stations, which in turn broadcast the programs to the public on a predetermined schedule. Programming may originate in the station's own studio, from an affiliated network, or from an external source.

40. According to Commission staff review of the BIA Financial Network, Inc. Media Access Pro Television Database as of March 31, 2013, about 90 percent of an estimated 1,385 commercial television stations in the United States have revenues of $38.5 million or less. Based on this data and the associated size standard, we conclude that the majority of such establishments are small. The Commission has estimated the number of licensed noncommercial educational ("NCE") stations to be 396. We do not have revenue estimates for NCE stations. These stations rely primarily on grants and contributions for their operations, so we will assume that all of these entities qualify as small businesses. In addition, there are approximately 567 licensed Class A stations, 2,227 licensed low power television ("LPTV") stations, and 4,518 licensed TV translators. Given the nature of these services, we will presume that all LPTV licensees qualify as small entities under the above SBA small business size standard.

41. We note that in assessing whether a business entity qualifies as small under the above definition, business control affiliations must be included. Our estimate, therefore, likely overstates the number of small entities affected by the proposed rules because the revenue figures on which this estimate is based do not include or aggregate revenues from affiliated companies.

42. In addition, an element of the definition of "small business" is that the entity not be dominant in its field of operation. The Commission is unable at this time and in this context to define or quantify the criteria that would establish whether a specific television station is dominant in its market of operation. Accordingly, the foregoing estimate of small businesses to which the rules may apply does not exclude any television stations from the definition of a small business on this basis and is therefore over-inclusive to that extent. An additional element of the definition of "small business" is that the entity must be independently owned and operated. It is difficult at times to

assess these criteria in the context of media entities, and our estimates of small businesses to which they apply may be over-inclusive to this extent.

43. *Radio Stations.* This Economic Census category comprises establishments primarily engaged in broadcasting aural programs by radio to the public. Programming may originate in the station's own studio, from an affiliated network, or from an external source. The SBA defines a radio broadcasting entity that has $38.5 million or less in annual receipts as a small business. According to Commission staff review of the BIA Kelsey Inc. Media Access Radio Analyzer Database as of June 5, 2013, about 90 percent of the 11,340 of commercial radio stations in the United States have revenues of $38.5 million or less. Therefore, the majority of such entities are small. The Commission has estimated the number of licensed noncommercial radio stations to be 3,917. We do not have revenue data or revenue estimates for these stations. These stations rely primarily on grants and contributions for their operations, so we will assume that all of these entities qualify as small businesses. We note that in assessing whether a business entity qualifies as small under the above definition, business control affiliations must be included. In addition, to be determined to be a "small business," the entity may not be dominant in its field of operation. We note that it is difficult at times to assess these criteria in the context of media entities, and our estimate of small businesses may therefore be over-inclusive.

44. The same SBA definition that applies to radio broadcast licensees would apply to low power FM ("LPFM") stations. The SBA defines a radio broadcast station as a small business if such station has no more than $38.5 million in annual receipts. Currently, there are approximately 864 licensed LPFM stations. Given the nature of these services, we will presume that all of these licensees qualify as small under the SBA definition.

45. *Wired Telecommunications Carriers.* This industry comprises establishments "primarily engaged in operating and/or providing access to transmission facilities and infrastructure that they own and/or lease for the transmission of voice, data, text, sound, and video using wired telecommunications networks." Transmission facilities "may be based on a single technology or a combination of technologies." Establishments in this industry use the wired telecommunications network facilities that they operate to provide a variety of services, such as wired telephony services, including VoIP services; wired (cable) audio and video programming distribution; and wired broadband Internet services. By exception, "establishments providing satellite television distribution services using facilities and infrastructure that they operate are included in this industry." In this category, the SBA deems a wired telecommunications carrier to be small if it has 1,500 or fewer employees. Census data for 2007 shows 3,188 firms in this category. Of these, 3,144 had fewer than 1,000 employees. On this basis, the Commission estimates that a substantial majority of the providers of wired telecommunications carriers are small.

46. *Cable Television Distribution Services.* Since 2007, these services have been defined within the broad economic census category of Wired Telecommunications Carriers, which was developed for small wireline businesses. This category is defined as follows: "This industry comprises establishments primarily engaged in operating and/or providing access to transmission facilities and infrastructure that they own and/or lease for the transmission of voice, data, text, sound, and video using wired telecommunications networks. Transmission facilities may be based on a single technology or a combination of technologies. Establishments in this industry use the wired telecommunications network facilities that they operate to provide a variety of services, such as wired telephony services, including VoIP services; wired (cable) audio and video programming distribution; and wired broadband Internet services. The SBA has developed a small business size standard for this category, which is: All such businesses having 1,500 or fewer employees. Census data for 2007 shows 3,188 firms in this category. Of these, 3,144 had fewer than 1,000 employees. Therefore, under this size standard, we estimate that the majority of these businesses can be considered small.

47. *Cable Companies and Systems (Rate Regulation).* The Commission has developed its own small business size standards for the purpose of cable rate regulation. Under the Commission's rules, a "small cable company" is one serving 400,000 or fewer subscribers nationwide. Industry data indicate that there are currently 4,600 active cable systems in the United States. Of this total, all but nine cable operators nationwide are small under the 400,000-subscriber size standard. In addition, under the Commission's rate regulation rules, a "small system" is a cable system serving 15,000 or fewer subscribers. Current Commission records show 4,600 cable systems nationwide. Of this total, 3,900 cable systems have fewer than 15,000 subscribers, and 700 systems have 15,000 or more subscribers, based on the same records. Thus, under this standard as well, we estimate that most cable systems are small entities.

48. *Cable System Operators (Telecom Act Standard).* The Communications Act of 1934, as amended, also contains a size standard for small cable system operators, which is "a cable operator that, directly or through an affiliate, serves in the aggregate fewer than 1 percent of all subscribers in the United States and is not affiliated with any entity or entities whose gross annual revenues in the aggregate exceed $250,000,000." There are approximately 52,403,705 cable video subscribers in the United States today. Accordingly, an operator serving fewer than 524,037 subscribers shall be deemed a small operator if its annual revenues, when combined with the total annual revenues of all its affiliates, do not exceed $250 million in the aggregate. Based on available data, we find that all but nine incumbent cable operators are small entities under this size standard. We note that the Commission neither requests nor collects information on whether cable system operators are affiliated with entities whose gross annual revenues exceed $250 million. Although it seems certain that some of these cable system operators are affiliated with entities whose gross annual revenues exceed $250,000,000, we are unable at this time to estimate with greater precision the number of cable system operators that would qualify as small cable operators under the definition in the Communications Act.

49. *Broadband Radio Service and Educational Broadband Service.* Broadband Radio Service systems, previously referred to as Multipoint Distribution Service ("MDS") and Multichannel Multipoint Distribution Service ("MMDS") systems, and "wireless cable," transmit video programming to subscribers and provide two-way high speed data operations using the microwave frequencies of the Broadband Radio Service ("BRS") and Educational Broadband Service ("EBS") (previously referred to as the Instructional Television Fixed Service ("ITFS")). In connection with the 1996 BRS auction, the Commission established a "small business" as an entity that had annual average gross revenues of no more than $40 million in

the previous three years. The BRS auctions resulted in 67 successful bidders obtaining licensing opportunities for 493 Basic Trading Areas ("BTAs"). Of the 67 auction winners, 61 met the definition of a small business. BRS also includes licensees of stations authorized prior to the auction. At this time, we estimate that of the 61 small business BRS auction winners, 48 remain small business licensees. In addition to the 48 small businesses that hold BTA authorizations, there are approximately 392 incumbent BRS licensees that are considered small entities. After adding the number of small business auction licensees to the number of incumbent licensees not already counted, we find that there are currently approximately 440 BRS licensees that are defined as small businesses under either the SBA or the Commission's rules. In 2009, the Commission conducted Auction 86, which resulted in the licensing of 78 authorizations in the BRS areas. The Commission offered three levels of bidding credits: (i) A bidder with attributed average annual gross revenues that exceed $15 million and do not exceed $40 million for the preceding three years (small business) will receive a 15 percent discount on its winning bid; (ii) a bidder with attributed average annual gross revenues that exceed $3 million and do not exceed $15 million for the preceding three years (very small business) will receive a 25 percent discount on its winning bid; and (iii) a bidder with attributed average annual gross revenues that do not exceed $3 million for the preceding three years (entrepreneur) will receive a 35 percent discount on its winning bid. Auction 86 concluded in 2009 with the sale of 61 licenses. Of the ten winning bidders, two bidders that claimed small business status won four licenses; one bidder that claimed very small business status won three licenses; and two bidders that claimed entrepreneur status won six licenses.

50. In addition, the SBA's placement of Cable Television Distribution Services in the category of Wired Telecommunications Carriers is applicable to cable-based Educational Broadcasting Services. Since 2007, these services have been defined within the broad economic census category of Wired Telecommunications Carriers, which was developed for small wireline businesses. This category is defined as follows: "This industry comprises establishments primarily engaged in operating and/or providing access to transmission facilities and infrastructure that they own and/or lease for the transmission of voice, data, text, sound, and video using wired telecommunications networks. Transmission facilities may be based on a single technology or a combination of technologies. Establishments in this industry use the wired telecommunications network facilities that they operate to provide a variety of services, such as wired telephony services, including VoIP services; wired (cable) audio and video programming distribution; and wired broadband Internet services." The SBA has developed a small business size standard for this category, which is: All such businesses having 1,500 or fewer employees. Census data for 2007 shows 3,188 firms in this category. Of these, 3,144 had fewer than 1,000 employees. Therefore, under this size standard, we estimate that the majority of these businesses can be considered small. Therefore, under this size standard, we estimate that the majority of businesses can be considered small entities. In addition to Census data, the Commission's internal records indicate that as of September 2014, there are 2,207 active EBS licenses. The Commission estimates that of these 2,207 licenses, the majority are held by non-profit educational institutions and school districts, which are by statute defined as small businesses.

51. *Wireless Telecommunications Carriers (except satellite).* This industry comprises establishments engaged in operating and maintaining switching and transmission facilities to provide communications via the airwaves. Establishments in this industry have spectrum licenses and provide services using that spectrum, such as cellular phone services, paging services, wireless Internet access, and wireless video services. The appropriate size standard under SBA rules for the category "Wireless Telecommunications Carriers (except satellite)" is that a business is small if it has 1,500 or fewer employees. Census data for 2007 show that there were 1,383 firms that operated for the entire year. Of this total, 1,368 firms had employment of fewer than 1000 employees. Thus under this category and the associated small business size standard, the Commission estimates that the majority of wireless telecommunications carriers (except satellite) are small.

52. *Incumbent Local Exchange Carriers (Incumbent LECs).* Neither the Commission nor the SBA has developed a size standard for small businesses specifically applicable to incumbent local exchange services. The closest applicable size standard under SBA rules is for Wired Telecommunications Carriers. This category is defined as follows: "This industry comprises establishments primarily engaged in operating and/or providing access to transmission facilities and infrastructure that they own and/or lease for the transmission of voice, data, text, sound, and video using wired telecommunications networks. Transmission facilities may be based on a single technology or a combination of technologies. Establishments in this industry use the wired telecommunications network facilities that they operate to provide a variety of services, such as wired telephony services, including VoIP services; wired (cable) audio and video programming distribution; and wired broadband Internet services. The SBA has developed a small business size standard for this category, which is: All such businesses having 1,500 or fewer employees. Census data for 2007 shows 3,188 firms in this category. Of these, 3,144 had fewer than 1,000 employees. Consequently, the Commission estimates that most providers of incumbent local exchange service are small businesses.

53. We have included small incumbent LECs in this present RFA analysis. As noted above, a "small business" under the RFA is one that, inter alia, meets the pertinent small business size standard (*e.g.*, a telephone communications business having 1,500 or fewer employees), and "is not dominant in its field of operation." The SBA's Office of Advocacy contends that, for RFA purposes, small incumbent LECs are not dominant in their field of operation because any such dominance is not "national" in scope. We have therefore included small incumbent LECs in this RFA analysis, although we emphasize that this RFA action has no effect on Commission analyses and determinations in other, non-RFA contexts.

54. *Competitive Local Exchange Carriers (Competitive LECs), Competitive Access Providers (CAPs), Shared-Tenant Service Providers, and Other Local Service Providers.* Neither the Commission nor the SBA has developed a small business size standard specifically for these service providers. The appropriate size standard under SBA rules is for the category Wired Telecommunications Carriers. Under that size standard, such a business is small if it has 1,500 or fewer employees. According to Commission data, 1,442 carriers reported that they were engaged in the provision of either competitive local exchange services or competitive access provider services. Of these 1,442 carriers, an estimated 1,256

have 1,500 or fewer employees and 186 have more than 1,500 employees. In addition, 17 carriers have reported that they are Shared-Tenant Service Providers, and all 17 are estimated to have 1,500 or fewer employees. In addition, 72 carriers have reported that they are Other Local Service Providers. Of the 72, seventy have 1,500 or fewer employees and two have more than 1,500 employees. Consequently, the Commission estimates that most providers of competitive local exchange service, competitive access providers, Shared-Tenant Service Providers, and Other Local Service Providers are small.

55. *Satellite Telecommunications.* This category comprises firms "primarily engaged in providing telecommunications services to other establishments in the telecommunications and broadcasting industries by forwarding and receiving communications signals via a system of satellites or reselling satellite telecommunications." The category has a small business size standard of $32.5 million or less in average annual receipts, under SBA rules. For this category, Census Bureau data for 2007 show that there were a total of 512 firms that operated for the entire year. Of this total, 482 firms had annual receipts of less than $25 million. Consequently, we estimate that the majority of satellite telecommunications providers are small entities.

56. *All Other Telecommunications.* "All Other Telecommunications" is defined as follows. "This U.S. industry comprises establishments primarily engaged in providing specialized telecommunications services, such as satellite tracking, communications telemetry, and radar station operation. This industry also includes establishments primarily engaged in providing satellite terminal stations and associated facilities connected with one or more terrestrial systems and capable of transmitting telecommunications to, and receiving telecommunications from, satellite systems. Establishments providing Internet services or voice over Internet protocol (VoIP) services via client-supplied telecommunications connections are also included in this industry. The SBA has developed a small business size standard for "All Other Telecommunications," which consists of all such firms with gross annual receipts of $32.5 million or less. For this category, census data for 2007 show that there were 2,383 firms that operated for the entire year. Of those firms, a total of 2,346 had gross annual receipts of less than $25 million. Thus, we estimate that the majority of All Other Telecommunications firms can be considered small.

57. *Direct Broadcast Satellite ("DBS") Service.* DBS service is a nationally distributed subscription service that delivers video and audio programming via satellite to a small parabolic "dish" antenna at the subscriber's location. DBS, by exception, is now included in the SBA's broad economic census category, Wired Telecommunications Carriers, which was developed for small wireline businesses. The SBA has developed a small business size standard for this category, which is: All such businesses having 1,500 or fewer employees. Census data for 2007 shows 3,188 firms in this category. Of these, 3,144 had fewer than 1,000 employees. Therefore, under this size standard, the majority of such businesses can be considered small. However, the data we have available as a basis for estimating the number of such small entities were gathered under a superseded SBA small business size standard formerly titled "Cable and Other Program Distribution." The definition of Cable and Other Program Distribution provided that a small entity is one with $12.5 million or less in annual receipts. Currently, only two entities provide DBS service, which requires a great investment of capital for operation: DIRECTV and DISH Network. Each currently offers subscription services. DIRECTV and DISH Network each report annual revenues that are in excess of the threshold for a small business. Because DBS service requires significant capital, we believe it is unlikely that a small entity as defined by the SBA would have the financial wherewithal to become a DBS service provider.

3. Description of Projected Reporting, Recordkeeping, and Other Compliance Requirements

58. There are revisions to current Part 11 reporting, recordkeeping, or compliance requirements set forth in the *Order*. Specifically, the *Order* revises section 11.21(a) to require that State EAS Plans include a description of what steps have been taken by broadcasters, cable systems, and other entities subject to the Part 11 rules (generally referred to as "EAS Participants"), whether individually or in conjunction with state and local emergency authorities, to disseminate or broadcast, or otherwise make available, EAS alert content to non-English speaking audiences in such audiences' primary language. This *Order* also requires that State EAS Plans include a description of any future actions planned by EAS Participants, in consultation with state and local emergency authorities, to provide EAS alert content available in languages other than English to its non-English speaking audience(s), along with an explanation for the Participant's decision to plan or not plan such actions. The objectives of these rule changes are to ensure that the Commission has sufficient and accurate information on any existing state and local mechanisms to distribute multilingual state and local EAS alert content, and more generally, to ensure that the issue of disseminating EAS alert content to non-English speaking audiences has been examined by EAS Participants and state and local emergency authorities, as coordinated by the SECCs.

4. Steps Taken To Minimize the Significant Economic Impact on Small Entities and Significant Alternatives Considered

59. The RFA requires an agency to describe any significant, specifically small business alternatives that it has considered in reaching its conclusions, which may include the following four alternatives (among others): "(1) the establishment of differing compliance or reporting requirements or timetables that take into account the resources available to small entities; (2) the clarification, consolidation, or simplification of compliance or reporting requirements under the rule for small entities; (3) the use of performance, rather than design, standards; and (4) an exemption from coverage of the rule, or any part thereof, for small entities."

60. Based on the Commission's review of the record, the Commission finds that it is practicable for all SECCs and EAS Participants, including small and rural EAS Participants, to comply with the minimal reporting requirements set forth in the *Order* without incurring unduly burdensome costs. With respect to alternative approaches, the Commission already has invited EAS Participants and other stakeholders to describe their multilingual alerting activities generally in the 2014 Public Notice, but the response to that request for voluntary submission of information was sparse an inadequate.

61. Further, this *Order* finds that the life-saving public safety benefits of imposing the reporting requirements, which include improved Federal oversight of the EAS, potential expansion of access to EAS alert content by those who communicate in a language other than English or may have a limited understanding of the English language, aiding state decision-making in multilingual EAS activities, and

helping consumers to understand the level of multilingual alerting that exists in their areas, far outweigh the one-time, minimal costs of such requirements.

62. Finally, in the event that small entities face unique circumstances with respect to these requirements, such entities may request waiver relief from the Commission. Accordingly, the Commission finds that it has discharged its duty to consider the burdens imposed on small entities.

63. *Report to Congress:* The Commission will send a copy of the *Order,* including this FRFA, in a report to be sent to Congress and the Government Accountability Office pursuant to the Congressional Review Act. In addition, the Commission will send a copy of the *Order,* including this FRFA, to the Chief Counsel for Advocacy of the SBA. A copy of the *Order* and FRFA (or summaries thereof) will also be published in the **Federal Register**.

### IV. Ordering Clauses

64. Accordingly, *it is ordered* that pursuant to sections 1, 2, 4(i), 4(o), 301, 303(r), 303(v), 307, 309, 335, 403, 624(g), 706, and 715 of the Communications Act of 1934, as amended, 47 U.S.C. 151, 152, 154(i), 154(o), 301, 303(r), 303(v), 307, 309, 335, 403, 544(g), 606, and 615, this *Order is adopted,* and the Petition for Immediate Interim Relief filed by the Independent Spanish Broadcasters Association, the Office of Communication of the United Church of Christ, Inc., and the Minority Media and Telecommunications Council is hereby *granted* as described herein, and otherwise *denied.*

65. *It is further ordered* that the rules adopted herein, which contain new or modified information collection requirements, *will become effective* on the date specified in a Commission notice published in the **Federal Register** announcing their approval under the Paperwork Reduction Act by the Office of Management and Budget, which date will be June 6, 2016.

66. *It is further ordered* that the Commission's Consumer and Governmental Affairs Bureau, Reference Information Center, *shall send* a copy of this *Order,* including the Regulatory Flexibility Analysis, to the Chief Counsel for Advocacy of the Small Business Administration.

### List of Subjects in 47 CFR Part 11

Radio, Television.

Federal Communications Commission.

**Marlene H. Dortch,**

*Secretary.*

### Final Rules

For the reasons discussed in the preamble, the Federal Communications Commission amends 47 CFR part 11 as follows:

## PART 11—EMERGENCY ALERT SYSTEM (EAS)

■ 1. The authority citation for part 11 continues to read as follows:

**Authority:** 47 U.S.C. 151, 154 (i) and (o), 303(r), 544(g) and 606.

■ 2. Section 11.21 is amended by revising the introductory text and adding paragraphs (d) through (f) to read as follows:

### §11.21 State and local area plans and FCC mapbook.

EAS plans contain guidelines which must be followed by EAS Participants' personnel, emergency officials, and National Weather Service (NWS) personnel to activate the EAS. The plans include the EAS header codes and messages that will be transmitted by key EAS sources (NP, LP, SP and SR). State and local plans contain unique methods of EAS message distribution such as the use of the Radio Broadcast Data System (RBDS). The plans also include information on actions taken by EAS Participants, in coordination with state and local governments, to ensure timely access to EAS alert content by non-English speaking populations. The plans must be reviewed and approved by the Chief, Public Safety and Homeland Security Bureau, prior to implementation to ensure that they are consistent with national plans, FCC regulations, and EAS operation.

\* \* \* \* \*

(d) EAS Participants are required to provide the following information to their respective State Emergency Communications Committees (SECC) within one year from the publication in the **Federal Register** of a notice announcing the approval by the Office of Management and Budget of the modified information collection requirements under the Paperwork Reduction Act of 1995 and an effective date of the rule amendment:

(1) A description of any actions taken by the EAS Participant (acting individually, in conjunction with other EAS Participants in the geographic area, and/or in consultation with state and local emergency authorities), to make EAS alert content available in languages other than English to its non-English speaking audience(s),

(2) A description of any future actions planned by the EAS Participant, in consultation with state and local emergency authorities, to provide EAS alert content available in languages other than English to its non-English speaking audience(s), along with an explanation for the Participant's decision to plan or not plan such actions, and

(3) Any other relevant information that the EAS Participant may wish to provide, including state-specific demographics on languages other than English spoken within the state, and identification of resources used or necessary to originate current or proposed multilingual EAS alert content.

(e) Within six months of the expiration of the one-year period referred to in subsection (d) of this section, SECCs shall, as determined by the Commission's Public Safety and Homeland Security Bureau, provide a summary of such information as an amendment to or as otherwise included as part of the State EAS Plan filed by the SECC pursuant to this section 11.21.

(f) EAS Participants shall, within 60 days of any material change to the information they have reported pursuant to paragraphs (d)(1) and (2) of this section, submit letters describing such change to both their respective SECCs and the Chief, Public Safety and Homeland Security Bureau. SECCs shall incorporate the information in such letters as amendments to the State EAS Plans on file with the Bureau under this section 11.21.

[FR Doc. 2016–09059 Filed 5–5–16; 8:45 am]

**BILLING CODE 6712–01–P**